**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**LAURA HAM**                                                                                    **PLAINTIFF**

**v.**                                                                  **CIVIL ACTION NO.:** 1:26cv116 HSO-BWR

**GPS HOSPITALITY PARTNERS IV, LLC**                                        **DEFENDANT**

**COMPLAINT**
**JURY TRIAL DEMANDED**

**COMES NOW** the Plaintiff, Laura Ham, by and through her counsel, The Watson

Law Firm, PLLC, brings this action to recover damages for violations of her rights pursuant

to Title VII of the Civil Rights Act of 1964 for sex discrimination and sexual harassment

against the Defendant, GPS Hospitality Partners IV, LLC.  In support of this cause, the

Plaintiff would show unto the Court the following facts to-wit:

**THE PARTIES**

1.      Plaintiff, Laura Ham, is a female resident of Hancock County, Mississippi.

2.      Defendant, GPS Hospitality Partners IV, LLC, may be served with process

by serving its registered agent, Corporation Service Company, 109 Executive Drive, Suite

3, Madison, Mississippi 39110.

**JURISDICTION AND VENUE**

3.      This Court has federal question jurisdiction pursuant to Title VII of the Civil

Rights Act of 1964.

4.      This Court has subject matter jurisdiction, and venue is proper in this Court.

5.      Plaintiff filed a Charge of Discrimination against with the EEOC on August

28, 2024, a true and correct copy of which is attached as Exhibit "A."  The EEOC issued

a Notice of Right to Sue on January 15, 2026, a true and correct copy of which is attached

1

as Exhibit "B."  Plaintiff timely files this action within ninety (90) days of receipt of her Notice of Right to Sue.

## STATEMENT OF FACTS

6.    Plaintiff is a 35-year-old female resident of Hancock County, Mississippi.

7.    Plaintiff was hired on June 28, 2022, as a General Manager at GPS Hospitality Partners IV, LLC (GPS).

8.    On June 26, 2024, Vice President Joe Waller grabbed Plaintiff's buttocks and pulled her body against his own.

9.    Plaintiff tried to push Mr. Waller away and made it clear that his sexually harassing action was unwanted.

10.    On July 16, 2024, Plaintiff complained about the sexual harassment incident to District Leader Joey Gaspard.

11.    Mr. Gaspard instructed Plaintiff to report the incident to Human Resources.

12.    Plaintiff complied with that instruction.

13.    On July 22, 2024, Plaintiff submitted a written statement to Human Resources describing the incident in which she was sexually harassed by Mr. Waller.

14.    Specifically, she wrote, "Joe Waller walked towards me, grabbed me by my waist with his fingertips on my butt.

15.    He pulled me against his body and held me there.

16.    I could feel his breath on my face and forehead.

17.    I was trying to lean away from him, but I could not because of how tight he was holding me against him.

18.    I made direct eye contact with both Kevin and Joey, hoping that they would

intervene. They did not…".

19.     On August 8, 2024, Plaintiff received a letter from Director of Human Resources Cassandra Fischels.

20.     In this letter, Ms. Fischels alleged that "…based on our review of the information we gathered during our review, including interviews with two witnesses, we have determined there is insufficient evidence to support that Joe engaged in the alleged inappropriate touching…we do believe it is appropriate to remind you of our continued concerns with your performance, which was the purpose of Joe's visit on 6/26. As Joe mentioned, we need to see marked and prompt improvement in the following areas: ACR, SOS, achievement of target staffing goals & total sales…Attached is the Action Plan that Joey put together for you in April. We will review your achievement toward these outlined goals in 30 days. Please understand that, if we do not see marked improvement, further disciplinary action will occur, up to and including termination of employment."

21.     On August 28, 2024, Plaintiff filed an EEOC Charge of sex harassment against GPS.

22.     On September 9, 2024, Plaintiff was notified that Director of Operations Kevin Ray, Mr. Gaspard, and Mr. Waller were all coming to meet with her for a store visit.

23.     On September 9, 2024, since her complaint of Mr. Waller's sexual harassment was allegedly not substantiated, Plaintiff was left with no choice but to consider herself constructively discharged.

24.     On October 9, 2024, in response to Plaintiff's EEOC Charge, GPS submitted a Position Statement to the EEOC.

25.     GPS's Position Statement alleges that, "Many of the operative facts are not

in dispute. On June 26, 2024, Mr. Waller, Mr. Ray, and Mr. Gaspard visited the Charging Party's restaurant to address the Charging Party's ongoing performance issues, which were previously documented on April 1, April 14, and May 8, 2024. At the conclusion of the visit, while the Charging Party, Mr. Waller, Mr. Ray, and Mr. Gaspard were standing in the parking lot, Mr. Waller gave the Charging Party a quick and innocuous side-hug and made a few encouraging comments about their confidence in her ability to improve her performance and the performance of the restaurant."

26.    Plaintiff contends this allegation is false, misleading, and omits essential context.

27.    In January 2024, Plaintiff was promoted from the role of Assistant Manager to being a General Manager and she was assigned to work at the store in Bay Saint Louis.

28.    This store had a history of being the poorest rated store in many aspects.

29.    After serving as a General Manager for years, the previous General Manager of the Bay Saint Louis store had stepped down to the role of an Assistant Manager because she was not given the resources to correct the many problems at the store.

30.    Plaintiff requested that she not be assigned to that store, but it was assigned to her anyway.

31.    Plaintiff also contends the three men conducted a store visit which, as previously stated, had a long history of problems.

32.    Plaintiff contends the visit on June 26th was not anything unique or special, i.e., the same three men visited all the stores in the days immediately prior and following the 26th.

33.    The performance issues were not viewed so much as against her per se so much as against the store as a whole.

34.    It is also noteworthy that Mr. Gaspard did not keep track of his alleged action plan.

35.    Prior to Plaintiff's complaint of sexual harassment, there had been no significant effort on his part to address the plan.

36.    Finally, Plaintiff adamantly contends that Mr. Waller did not merely give her "a quick and innocuous side-hug" as alleged.

37.    Plaintiff maintains that Mr. Waller grabbed her waist, with his fingers on her buttocks, and he pulled her body against his own.

38.    Plaintiff tried to push Mr. Waller away and made it clear that his sexually harassing action was unwanted.

39.    She also maintains that while being held against Mr. Waller and against her will, she made direct eye contact with Mr. Ray and Mr. Gaspard, hoping that they would intervene, but they both disregarded her.

40.    GPS's Position Statement alleges that, "Several weeks later, the Charging Party told Mr. Gaspard that Mr. Waller grabbed her butt when he hugged her during their previous visit. Mr. Gaspard responded that he had not seen anything inappropriate, but would report the Charging Party's complaint to Mr. Ray. It is undisputed that, although the Charging Party acknowledged GPS's Employee Complaint Procedure, which requires all allegations of sexual harassment to be reported directly to Human Resources, she failed to notify Human Resources of her allegations."

41.    Plaintiff contends this allegation mischaracterizes the events that occurred

and is misleading.

42.     On July 16, 2024, Plaintiff complained about the sexual harassment incident to District Leader Joey Gaspard.

43.     Mr. Gaspard instructed Plaintiff to report the incident to Human Resources.

44.     Plaintiff complied with that instruction.

45.     On July 22, 2024, Plaintiff submitted a written statement to Human Resources describing the incident in which she was sexually harassed by Mr. Waller.

46.     Specifically, she wrote, "Joe Waller walked towards me, grabbed me by my waist with his fingertips on my butt. He pulled me against his body and held me there.  I could feel his breath on my face and forehead. I was trying to lean away from him but I could not because of how tight he was holding me against him. I made direct eye contact with both Kevin and Joey, hoping that they would intervene. They did not…".

47.     Notably, when Plaintiff reported the sexual harassment to Mr. Gaspard, Mr. Gaspard did not comply with GPS's policy and escalate her complaint to Human Resources.

48.     Instead, he reported the situation to Mr. Ray and then the two of them reported the situation to Mr. Waller.

49.     Plaintiff strongly suspects the animus for this action was an effort to cover up and/or prepare a defense rather than to address her complaint in good faith.

50.     GPS's Position Statement alleges that, "On Saturday, July 20, 2024, Mr. Waller notified Human Resources of the Charging Party's complaint against him after learning about it from Mr. Gaspard. Human Resources immediately began its investigation by asking Mr. Waller, Mr. Ray, Mr. Gaspard, and the Charging Party to

provide written statements. Human Resources also interviewed a third witness identified by the Charging Party and reviewed video footage from the restaurant on the date of the incident."

51.    Plaintiff contends this allegation confirms what was stated above: in violation of GPS policy, rather than escalating Plaintiff's complaint to Human Resources, Mr. Gaspard notified Mr. Ray and Mr. Waller about Plaintiff's complaint.

52.    Only after that, on July 20, 2024, did Mr. Waller report the situation to Human Resources.

53.    Notably, Mr. Waller's sexually harassing action (i.e., the inappropriate hug) occurred outside of the restaurant.

54.    Months earlier, Plaintiff had reported that the store's outdoor surveillance camera did not work, but nothing had ever been done to correct that situation.

55.    Thus, the sexually harassing action was not observable on any video footage.

56.    Plaintiff further contends that Mr. Gaspard, Mr. Ray, and Mr. Waller united in their plan to submit false written statements, and to deny the events that truly occurred on June 26, 2024.

57.    GPS's Position Statement alleges that, "Based on Human Resources investigative review, no video footage captured the parties' interaction in the parking lot, and none of the three witnesses identified were able to corroborate the Charging Party's allegation that Mr. Waller grabbed her butt. Mr. Waller adamantly denied grabbing the Charging Party's butt and likewise denied ever touching the Charging Party in a sexual or inappropriate manner. After the Charging Party's complaint, GPS re-trained Mr. Waller,

7

Mr. Ray, and Mr. Gaspard on the Company's EEO and anti-retaliation policies, and also re-trained Mr. Waller on the Company's Respect policy. On August 9, 2024, Human Resources notified the Charging Party that, based upon its investigation, it was unable to corroborate her allegation."

58. Plaintiff adamantly maintains that on June 26, 2024, Mr. Waller sexually harassed her, as previously described, and that it was directly observed by Mr. Gaspard and Mr. Ray.

59. The investigation was not corroborated because the three men made a unified plan to deny and falsify what occurred.

60. GPS's Position Statement alleges that, "In sum, although the Charging Paty failed to take advantage of GPS's Employee Complaint Procedure, it is undisputed that GPS took prompt action to investigate her allegations the same day they were reported to Human Resources. While the Charging Party may not agree with the outcome of GPS's investigation, her allegation of a single incident where Mr. Waller allegedly grabbed her butt while hugging her is insufficient to establish a hostile or abusive working environment as a matter of law. Moreover, because GPS exercised reasonable care to prevent and correct sexual harassment, and the Charging Party unreasonably failed to take advantage of GPS's remedial process, GPS is entitled to the Faragher/Ellerth affirmative defense. For these reasons and for the reasons discussed more fully below, GPS respectfully requests that this Charge be dismissed with a finding of "no cause.""

61. Plaintiff contends this allegation is misleading and mischaracterizes the events that occurred.

62. On June 26, 2026, when the incident occurred, Plaintiff reasonably

expected some type of action would be taken against Mr. Waller since both Mr. Ray and Mr. Gaspard directly observed the incident.

63.     Moreover, she reasonably feared retaliation given the significant power differential, i.e., Mr. Waller was the vice president of the company.

64.     Nevertheless, on July 16, 2024, Plaintiff complained to Mr. Gaspard about the sexually harassing incident and the events already described were set in motion.

65.     GPS's Position Statement alleges that, "The Charging Party began her employment with GPS on August 23, 2022 as a Restaurant Assistant Manager in Training. (Exhibit 2, Charging Party's Employee File, p. 6). (The Charging Party's Employee file is being produced as Exhibit 2 in response to the EEOC's RFI No. 1.) In January 2024, GPS promoted the Charging Party to Restaurant General Manager ("RGM") of the Burger King restaurant located at 814 US Highway 90, Bay Saint Louis, MS 39520, Store No. 1928. (*Id*., p. 1, 6). As the RGM, the Charging Party reported directly to District Leader Joey Gaspard. Her second-level supervisor was Director of Operations Kevin Ray, and her third-level supervisor was Vice President of Operations Joe Waller. As RGM, the Charging Party was directly responsible for supervising all Shift Leaders and Part Time Crew Members at her restaurant. (The employee roster for Store No. 1928 is being produced as Exhibit 3 in response to the EEOC's RFI No. 6.) Vickie Volan serves as GPS's Vice President of Human Resources. Cassie Fischels is the Director of Human Resources, and Daphne Walker is the Human Resources Manager.

66.     Plaintiff does not dispute this allegation.

67.     GPS's Position Statement alleges that, "After roughly 3 months as an RGM, on April 1, 2024 the Charging Party received her first written warning for unsatisfactory

9

performance. (Exhibit 4, First Write-Up). Specifically, Mr. Gaspard noted that the Charging Party failed to meet minimum expectations regarding her restaurant's food cost variance. (*Id.*). The Charging Party's write-up expressly stated that GPS "must see immediate and consistent improvement or further disciplinary action will occur up to and including termination of employment. (*Id.*). The Charging Party acknowledged receipt of this writeup on April 3, 2024.

On April 14, 2024, Mr. Gaspard issued the Charging Party a formal Action Plan outlining additional specific concerns he had with the Charging Party's performance, including staffing, speed of service, window time, sales, and overall profitability. (Exhibit 5, Action Plan). The Action plan specified the expected standard of performance, as well as specific actions the Charging Party should take for improvement. (*Id.*)."

68.    Plaintiff contends this allegation is partially accurate but omits significant context.

69.    Specifically, Plaintiff had become aware that certain employees were stealing food from her store.

70.    She reported the specific shift leaders who were stealing food to Mr. Gaspard.

71.    Mr. Gaspard responded, however, by disallowing Plaintiff to terminate the individuals, allegedly because they did not have any other shift leaders to replace them.

72.    It was required that Mr. Gaspard interview and approve prospective shift leaders, but Mr. Gaspard rarely came to the store, so this situation never improved.

73.    Similarly, the high food costs at the location had been a problem for years, certainly long before Plaintiff became the General Manager at the store.

74.    As in the case of the stolen food, Plaintiff reported to Mr. Gaspard that the high food costs would only improve when certain employees were replaced, yet again Mr. Gaspard refused to allow this to happen.

75.    GPS's Position Statement alleges that, "About a month after her first write-up, Mr. Gaspard issued the Charging Party a second written warning for unsatisfactory performance after she failed to complete on-boarding for a new employee. (Exhibit 6, Second Write-Up). Even after GPS's payroll department notified the Charging Party that the new team member's on-boarding wasn't complete, the Charging Party failed to address the issue until after the payroll period closed. (*Id*). As a result, the team member wasn't paid on time. (*Id*.). Again, the Charging Party's write-up expressly stated that GPS "must see immediate and consistent improvement or further disciplinary action will occur up to and including termination of employment. (*Id*.). The Charging Party acknowledged receipt of this writeup on May 8, 2024. (*Id*.)."

76.    Again, Plaintiff contends this allegation lacks context.

77.    Plaintiff consistently put forth her full ability to comply with the action plan.

78.    Although the allegation does not mention it, the action plan required actions to be taken by Mr. Gaspard as well, yet he failed to live up to his responsibilities.

79.    It was Mr. Gaspard's failure to comply with required actions that led to the untimely onboarding of this new employee and other problems as well.

80.    GPS's Position Statement alleges that, "On June 26, 2024, Mr. Waller, Mr. Ray, and Mr. Gaspard visited the Charging Party's restaurant to evaluate her progress and the restaurant's overall performance and to reemphasize the performance expectations that were in place for the Charging Party. They arrived around 11:00 am

and immediately met with the Charging Party in the lobby to discuss the restaurant's performance issues and determine how upper management could help.

They also interviewed a couple of other employees, including Shift Leaders Diondra Sylvester and Eric Johnson, to help identify the cause of the restaurant's poor performance. According to Mr. Waller, he could tell that the Charging Party was frustrated and upset about the feedback she received from Mr. Gaspard, Mr. Ray, and himself about their performance concerns of the restaurant. As a result, as they were leaving, Mr. Waller gave the Charging Party an innocuous and very quick side-hug, and made a few encouraging comments about their confidence in her ability to get her restaurant back on track. Mr. Ray and Mr. Gaspard were standing in front of Mr. Waller and the Charging Party and noticed **nothing** unusual or inappropriate during this interaction.

After their store visit, Mr. Waller, Mr. Ray, and Mr. Gaspard agreed that, if the Charging Party's restaurant's performance did not improve, their next step would be to place the Charging Party on a formal performance improvement plan ("PIP")."

81.    Plaintiff contends this allegation is false and mischaracterizes the events that occurred.

82.    Plaintiff adamantly maintains that Mr. Waller sexually harassed her by forcibly hugging her close to him, and grabbing her around the waist, with his fingers extending on to her butt, as described above.

83.    Plaintiff made it clear the action was unwanted and struggled to pull herself away from him.

84.    During the incident, she made direct eye contact with both Mr. Gaspard and Mr. Ray, but each of them disregarded the situation.

12

85.    On July 16, 2024, when Plaintiff reported the incident to Mr. Gaspard, in regard to Mr. Waller, Mr. Gaspard stated, "He can get a little handsy sometimes."

86.    Plaintiff contends this statement minimizes the truth and reveals that Mr. Gaspard knew the incident was sexually harassing and inappropriate.

87.    Regarding her job performance, Plaintiff admits she was somewhat frustrated following the feedback, because she felt unfairly blamed for issues that were: 1) longstanding and reasonably required more time to correct; and 2) partly the result of Mr. Gaspard's negligence in addressing issues she had already raised.

88.    GPS's Position Statement alleges that, "About 3 weeks after their in-person restaurant evaluation, on July 16, 2024, Mr. Gaspard visited the Charging Party's location to check in on the Charging Party's progress. As Mr. Gaspard was leaving, the Charging Party followed him to the parking lot and told him that Mr. Waller grabbed her butt when he hugged her during their last visit. Mr. Gaspard explained that he didn't see Mr. Waller touch her butt or pick up on any attempt by the Charging Party to "signal" to him or Mr. Ray that she was uncomfortable with the interaction.
Nevertheless, Mr. Gaspard assured the Charging Party that she would not be retaliated against for raising her complaint, and told her he would inform Mr. Ray of her allegation. Mr. Gaspard subsequently relayed the Charging Party's complaint to Mr. Ray, who told him to report it to Mr. Waller."

89.    Plaintiff contends this allegation is mostly accurate but omits significant context.

90.    The allegation openly admits that both Mr. Gaspard and Mr. Ray declined to follow GPS policy to notify Human Resources and instead reported Plaintiff's complaint

13

to Mr. Waller.

91.     Regarding Mr. Gaspard's claim that he "didn't see Mr. Waller touch her butt or pick up on any attempt by the Charging Party to "signal" to him or Mr. Ray that she was uncomfortable with the interaction", Plaintiff contends this is highly unlikely.

92.     Plaintiff asserts she made direct eye contact, conveying her distress, with Mr. Gaspard and Mr. Ray, and they both could clearly observe that Mr. Waller was holding her tightly against him.

93.     In contrast to this allegation's claim that the meeting gave Mr. Gaspard a chance to "check in on [Plaintiff's] progress", Plaintiff contends that nothing from the action plan was discussed by Mr. Gaspard, nor had it been since it was presented to her on April 14, 2024.

94.     GPS's Position Statement alleges that, "On Saturday, July 20, 2024, Mr. Gaspard called Mr. Waller and reported the Charging Party's complaint. Mr. Waller immediately contacted Ms. Volan, VP of Human Resources, so that her department could investigate the complaint. Ms. Volan, in turn, immediately instructed Mr. Waller to provide a written statement, and also emailed Mr. Gaspard and Mr. Ray the same afternoon and instructed them both to submit a written statement as well. (Exhibit 7, HR File 07406). (A copy of GPS's Investigative File regarding the Charging Party's complaint of sexual harassment is being produced as Exhibit 7 in response to RFI No. 3.) Ms. Volan further instructed Mr. Gaspard to obtain a written statement from the Charging Party or have her submit a written statement directly to Human Resources.

In his written statement, Mr. Gaspard described Mr. Waller's interaction with the Charging Party as a side-hug where Mr. Waller's arm was about chest high. (*Id.*, p.7). He stated he

and Mr. Ray were to the left of Mr. Waller and the Charging Party during the hug, and that they were facing Mr. Waller and the Charging Party as Mr. Waller spoke to her. (*Id.*). Mr. Gaspard recalled that Mr. Waller's arm position never changed, but he did give the Charging Party "a few gentle squeezes" that Mr. Gaspard interpreted as encouraging. (*Id.*). Mr. Gaspard confirmed that the Charging Party first complained to him about the interaction on the evening of July 16, and that he told Mr. Ray about the Charging Party's complaint on July 19. (*Id.*).

Mr. Ray likewise described the incident as a brief side-hug between Mr. Waller and the Charging Party in his written statement. (*Id.*)."

95.    Although some of the general facts of this allegation are accurate, Plaintiff contends this allegation significantly mischaracterizes the events that occurred and is misleading.

96.    Most significantly, Plaintiff adamantly maintains that Mr. Waller sexually harassed her by forcibly hugging her close to him, and grabbing her around the waist, with his fingers extending on to her butt, as described above.

97.    Plaintiff made it clear the action was unwanted and struggled to pull herself away from him.

98.    During the incident, Plaintiff made direct eye contact with both Mr. Gaspard and Mr. Ray, but each of them disregarded the situation.

99.    Plaintiff contends that Mr. Waller's description of the incident is patently false, and Mr. Gaspard's and Mr. Ray's descriptions of the incident were deliberately minimized to the point of being false as well.

100.    Plaintiff contends Mr. Gaspard and Mr. Ray likely feared reprisal from Mr.

15

Waller just as she had.

101.   GPS's Position Statement alleges that, "Mr. Waller also submitted a written statement to Ms. Volan addressing the Charging Party's allegations against him. Specifically, Mr. Waller admitted that he hugged the Charging Party on June 26, but denied that he touched or grabbed her butt and explicitly stated that such allegations were "not true." (Exhibit 8, Waller Statement). Mr. Waller recalled that he, Mr. Ray, and Mr. Gaspard gave the Charging Party some difficult feedback during the visit, and that he could tell she was upset by their conversation, which is what prompted him to give her a hug and tell her that he believed in her and they would do their part to help her be successful. (*Id*.).

Per Human Resources request, Mr. Gaspard looked for potential video footage of the alleged incident the following Monday, July 22, 2024. That afternoon, he emailed Human Resources to notify them that the exterior video camera at the Charging Party's location was down and needed to be replaced. (Exhibit 7, HR File 07406). In his email, Mr. Gaspard also notified HR that he received information that the Charging Party might be involved in a romantic relationship with one of her shift leaders. (*Id*.).

Although exterior video footage was unavailable, Human Resources Manager Daphne Walker obtained and reviewed internal footage from the restaurant location to determine whether another camera may have captured the alleged incident. (*Id*., p. 6). Based on her review, Ms. Walker determined none of the restaurant's cameras captured Mr. Waller's interaction with the Charging Party in the restaurant parking lot, although she noted Mr. Waller's arrival and departure times as well as one occasion inside the restaurant where Mr. Waller harmlessly placed his hand on the Charging Party's shoulder. (*Id*.)."

102.   As already addressed above, Plaintiff reported to Mr. Gaspard that the outside surveillance camera had not been working since prior to her taking over of the store.

103.   At that time that she reported it, Mr. Gaspard did not respond to this issue.

104.   Plaintiff denies that she was involved in a romantic relationship with one of her shift leaders.

105.   This allegation is false and frivolous.

106.   GPS's Position Statement alleges that, "That afternoon, the Charging Party emailed her statement detailing the events of June 26th directly to Ms. Walker. (*Id*., p. 5). Specifically, the Charging Party stated that "Joe Waller walked towards me, grabbed me by my waist with his fingers on my butt. He pulled me against his body and held me there." According to the Charging Party, she tried to lean away from him but could not, and made direct eye contact with both Mr. Ray and Mr. Gaspard, but they did not do anything. (*Id*.). The Charging Party admitted that, when she told Mr. Gaspard about the incident, he claimed he did not see anything. (*Id*.).

Upon receipt of the Charging Party's statement, Ms. Walker emailed her to determine whether she reported the incident to anyone besides Mr. Gaspard. (*Id*., p. 5). The Charging Party responded that she told her shift leaders about the incident right after it happened, and one shift leader, Eric Johnson, saw the end of the interaction. (*Id*.)."

107.   Plaintiff reasonably believes that the incident was observed by shift leaders Diondra Sylvester and Eric Johnson.

108.   GPS's Position Statement alleges that, "The next day, Human Resources Director Cassie Fischels interviewed Eric Johnson via phone and followed up via email

to confirm the contents of his witness statement. (*Id.*, p. 4). According to Mr. Johnson, the Charging Party had gone outside to smoke her vape, and he stood next to the door because he needed the Charging Party's assistance with the work schedule. (*Id.*). The Charging Party was facing Mr. Johnson and he saw Mr. Waller hug her. (*Id.*). According to Mr. Johnson, the Charging Party seemed "tense" and "uncomfortable." (*Id.*). When the Charging Party came inside, she began to cry, and after Mr. Johnson asked her what happened, she told him Mr. Waller grabbed her butt. (*Id.*). Mr. Johnson also claimed that Mr. Gaspard told the Charing Party that "Joe Waller gets a little handsy with people," and that the Charging Party felt uncomfortable that Mr. Waller instructed Mr. Gaspard to contact HR about the incident. (*Id.*)."

109. Plaintiff contends that predominantly this allegation is accurate and supports her description of the events that occurred.

110. Plaintiff maintains she was reluctant to report the issue to Human Resources because she feared Mr. Waller would retaliate against her.

111. Likewise, she felt uncomfortable when she heard that Mr. Waller was addressing the matter with Human Resources because she feared Mr. Waller would coordinate a revision of the events that occurred and that Mr. Gaspard and Mr. Ray would corroborate his false account out of loyalty to Mr. Waller.

112. Subsequently, on September 9, 2024, when those three men announced they were coming to her store, Plaintiff was placed in an intolerable situation.

113. She was left with no choice but to be constructively discharged.

114. GPS's Position Statement alleges that, "On July 25, 2024, Human Resources had Mr. Waller re-acknowledge the Company's EEO and anti-retaliation

policy, as well as GPS's Respect policy. (Exhibit 9, Waller Reacknowledgement). The same day, Human Resources also re-trained Mr. Ray on its Employee Complaint Procedure and specifically reminded him that all complaints of harassment must be reported directly to Human Resources. Mr. Ray also re-acknowledged GPS's EEO and antiretaliation policies. (Exhibit 10, Ray Reacknowledgement). Finally, Mr. Gaspard also reacknowledged GPS's EEO and anti-retaliation policies. (Exhibit 11, Gaspard Reacknowledgement).

On August 2, 2024, Mr. Ray called Human Resources to report that the Charging Party's performance issues were ongoing, and that Burger King Corporate was very concerned about her restaurant. (Exhibit 12, HR File 07477). Mr. Ray specifically sought guidance on documenting the Charging Party's continued performance issues since her PIP had been placed on hold pending the outcome of HR's investigation into her complaint. (*Id*.). Human Resources advised that it would review the Burger King Corporate data and get back with him regarding next steps."

115.   Plaintiff contends this communication came to her only days after her complaint was allegedly investigated.

116.   She contends the expediting of these alleged performance issues was a pretext for retaliation against her after she made her complaint of sexual harassment.

117.   GPS's Position Statement alleges that, "On August 5, 2024, Ms. Walker emailed the Charging Party to let her know GPS was taking her complaint very seriously and was in the process of completing its investigation. (Exhibit 7, HR File 07406, p 3). On August 9, 2024, Ms. Walker called the Charging Party to notify her that, based upon the Company's investigation, it was unable to corroborate her allegation that Mr. Waller

19

touched her inappropriately on June 26, 2024. (*Id*.). Ms. Walker also reminded the Charging Party of GPS's expectations of her performance moving forward. Following their phone conversation, Ms. Walker emailed the Human Resources Conclusion Letter as well as her April 2024 action plan to the Charging Party. (*Id*.).

The Charging Party filed the instant Charge of Discrimination on or around August 28, 2024 and voluntarily resigned her employment on September 9, 2024."

118.    As evidenced by the timing of events, Plaintiff contends that GPS expedited its alleged concerns with her job performance as a pretext for retaliation against her.

119.    There is little doubt that GPS's intention was to either drive Plaintiff to resign or terminate her, allegedly for job performance.

120.    Plaintiff contends she would not have resigned and did not resign, however, in the sense that she objectively wished to leave the job.

121.    Rather, when confronted with directly facing the same three men who coordinated a false defense against her complaint of sexual harassment, she was left with no choice but to be constructively discharged.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF TITLE VII - SEX DISCRIMINATION

122.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 121 above as if fully incorporated herein.

123.    Defendant discriminated against Plaintiff because of her sex, female, based on the facts identified above which constitutes a violation of Title VII of the Civil Rights Act of 1964.

124.    Defendant was motivated to discriminate against Plaintiff because she is a

20

female.

125.   Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as well as future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

126.   The unlawful actions of Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.  As such, Plaintiff is entitled to recover damages pursuant to Title VII and 42 U.S.C. § 1981a.

## COUNT II: VIOLATION OF TITLE VII – SEXUAL HARASSMENT

127.   Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 126 above as if fully incorporated herein.

128.   By the actions described above, Plaintiff has been discriminated against in the terms and conditions of her employment on the basis of her sex, female.

129.   By the actions described above, Defendants violated Title VII by allowing its employees to sexually harass Plaintiff in the workplace and by subjecting Plaintiff to a sexually hostile work environment.

130.   Plaintiff has been harmed as a result of the Defendant's discrimination, and the Defendant is liable to the Plaintiff for the same.

131.   Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as well as future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

132.   The unlawful actions of Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.  As such, Plaintiff is entitled to recover damages pursuant to Title VII and 42 U.S.C. § 1981a.

21

## **PRAYER FOR RELIEF**

**WHEREFORE PREMISES CONSIDERED,** Plaintiff respectfully prays that upon

hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount

to be determined by the jury:

1. Back wages;
2. Reinstatement or future pay in lieu of reinstatement;
3. Punitive damages;
4. Compensatory damages;
5. Attorney's fees;
6. Lost benefits;
7. Pre-judgement and post-judgment interest;
8. Costs and expenses; and
9. Such further relief as is deemed just and proper.

THIS the 15th day of April 2026.

Respectfully submitted,

Laura Ham, Plaintiff

By: /s/Louis H. Watson, Jr.
LOUIS H. WATSON, JR. (MB# 9053)
JANE A. WATSON (MB#106877)
Attorneys for Plaintiff

OF COUNSEL:

THE WATSON LAW FIRM, PLLC
1501 JACKSON AVE W STE 113 PMB 101
OXFORD MS 38655-2566
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
louis@thewatsonlawfirm.com
jane@thewatsonlawfirm.com